We'll hear the next case on the calendar, Crescenzi v. The City of New York. May it please the court, Devin Slack on behalf of the City of New York. This court has one interpretation of Section 7i before it that honors and gives effect to the entirety of that provision and also advances the primary legislative purpose behind the entire statute, which was to eliminate and avoid congestion on sidewalks in every way possible. And if you look at this statute, you kind of get this sense that the legislature took this kitchen sink approach to achieving that end. It starts by making clear that vending needs to occur in certain designated areas that are subject to a number of placement and other controls, including the key one here that they vend parallel to the curb and within three feet of the curb. And then it goes through and it enumerates all these other obstacles in a variety of ways, one after another, in these mutually reinforcing provisions, all of which get to this bottom line goal of ensuring that. I'll just ask a preliminary question. This case involves 298 summonses. Correct. And it's alleging Fourth Amendment violations in connection with the issuance of those summonses. And I understand that the city has stipulated that each of those summonses involved a Fourth Amendment event. And just before we get to the issues that are in the briefs, I'm stumbling because a summons, absent a seizure, doesn't implicate the Fourth Amendment. Yeah, to be honest, I think I probably would have taken that position, too, Your Honor, if I was litigating this below. I believe the theory behind it on the other side is that the vendors were stopped and were literally— Some of them may have been stopped. Some of them may not have been stopped. But this Court said in Berg that the issuance of a summons, non-felony pre-arraignment summons requiring a later court appearance without further restrictions doesn't constitute a Fourth Amendment event. I think that is absolutely true. I mean, I do think we have litigated it under the assumption that it is sufficient liberty deprivation. I probably would have made a different choice. Can I also ask you, just empirically, there are—and correct me if I'm wrong—125 Environmental Control Board decisions in the record. But the city didn't appeal any of those. That's correct, Your Honor. I believe it's— What are we to make of that? Not much. I mean, there are literally thousands of summons issued every year. The city doesn't appeal all of them. It appeals some. Those 120-some-odd decisions, I would just note, were made by the same five ALJs. Most of them made by one ALJ. A lot of them were made before the key decisions by the Appeals Board. Admittedly, some of them did come after. And I think that the most important thing—and this is just one indication of the reasonableness of the interpretation that we've put before the Court— is that the higher body of the ECB is the Appeals Board. And the clear implication from its decisions—and I think this is made most clearly in Dalton— is that Section 7i requires vending at the curb. The upshot of the respondents' arguments in those Appeals Board decisions was that the plaza isn't a sidewalk. That was their defense. It was rejected. And once you conclude that the plaza is a sidewalk, the only way the ECB Appeals Board could determine that the officers' orders to relocate were lawful is if Section 7i requires vending at the curb. Because under plaintiff's interpretation, the same orders that were issued by the issuing officers there would have been unlawful orders because, under their understanding, you can be anywhere on the sidewalk as long as you're not close to anything else. Let's take Subsection G, for example. And it says—and I'm quoting— No vending vehicle, pushcart, stand, goods, or any other item related to the operation of a vending machine shall touch, lean against, or be affixed permanently or temporarily to any building. So aren't buildings situated along the property line? And if Subsection I requires curbside vending, isn't then that requirement superfluous? Right. I mean, the phrase that G uses is any building or structure. And what I think is most significant about that provision is that it then provides an illustrative list. I mean, granted, it's not exclusive, but look at what they enumerate. All of the things are ordinarily by the curb. None of them comports with the understanding that we're talking about the buildings at the property line. Lamp posts, parking meters, mailboxes, traffic signal stations, fire hydrants, tree boxes, benches, bus shelters, refuse baskets, or traffic barriers. I think it's just a little awkward phrase that is building or structure. None of those are buildings in the normal understanding that I would do it. Very few of them are what I would call a structure. I mean, this is why I think when you look at this statue, what we're really talking about is a legislature that threw out pretty much everything it could think of that might be an obstacle and said, stay away from it, get by the curb. And that's because New York City is a massive geography with all kinds of different permutations. Some cellar doors are going to be five feet. Some are going to be eight feet. It is a legislature that at the time of drafting was trying to create rules, not just for the city that existed then, but the city that might exist for the future. And if I could just talk about one more provision, that's subsection H. I think what's interesting about H is that it does two different things. The first one is talking about fixed location businesses, something that includes the kiosks and newsstands that we walk by every day. But what's probably most interesting is that it uses the phrase first, a fixed location business there, but in the second part it uses a different phrase, and that is any commercial business or store. That is the commercial business or store, the building by the property line. And that's why we know that the legislature wasn't referring to the building by the property line elsewhere. And we know that because the second part of that provision, subsection H, is trying to talk about barriers to entrance ways to buildings, and it creates this radius of exclusion to do that. Let's say, though, located at the furthest possible distance on the sidewalk from the building line in subsection H. So why doesn't your interpretation of subsection I impose the same requirement, curbside vending in all circumstances? And if it does, then why isn't that interpretation of I, why doesn't that render subsection H superfluous? Few responses to that. I mean, first is nobody claims that our interpretation renders any provision of the statute superfluous. At most it's a word or two. And we're not talking about the Federal Congress, no offense to the legislatures up in Albany, but their statutes aren't always the tightest rafting. But here I think the provision, the piece of H that you're focusing on is actually an exception to a rule, and that's the main work done by the second part of H is this 20-foot radius that prohibits vending even when you are at the curb, and that's within 20 feet from an entranceway to any commercial building or store. And then the exception is when the entranceways are 40 feet apart, and the main work being done by the language there is that the vendor must be equal distance between them. And then just to make it crystal clear, we're saying not 40 feet equal distance in the middle of the sidewalk, get to the furthest part away from the sidewalk. Can I ask one question about the provision we're construing? It refers to specialized vending licensees occupying the eight linear feet of a public space parallel to the curb, but in the clause that we're concerned with, it refers to specialized vending licensees operating any vending business on any sidewalk. And my question was, do some of these licensees actually position themselves on the street? There is another provision, I believe, I forget what it is in 35A, that prohibits vending from a parked or double parked vehicle, and you're not otherwise allowed to obstruct traffic. So I think the provision in some ways contemplates vending in the street, but in reality, I don't think it happens. I mean, if it could happen, then that would be, I think, an argument supporting your construction, because they're not really then two clauses falling on each other. The one specific to the sidewalk is saying it has to be measured. If you're on the sidewalk, you have to measure from the curb. Yeah, I mean, I do think that there might have been a time when there was vending in the streets. There certainly was back in the 19th century when we were first trying to regulate vending. I think as a practical matter, it just doesn't actually happen. I mean, the core difference between the two clauses to me is that the second clause is specifying the fixed point from which to draw that free foot, and then it says towards the property line. And if you really expected those two clauses to be parallel at a bare minimum, you would have said perpendicular. But even that would be somewhat strange. Something that would allow vending carts to be right in the middle of the sidewalk is so fundamentally contrary to both what the legislature was trying to achieve and just our normal understanding of where vending is done on the sidewalk that you would expect them to be much more clear about such an odd result than just this kind of hidden construction, awkward reading property. Can I just follow up on Chief Judge Katzmann's question about H? A713 also prohibits placement over, for example, cellar doors, grills, manholes, access grading for subways. Is your response the same as to H, which is this was kind of a belt and suspenders? Maybe it wasn't the cleanest drafting in the world? I mean, I think that's part of it. Again, I think one of the most interesting things about that is it enumerates, for the most part, everything that is found by the curb ordinarily. The only thing that the plaintiffs have pointed to are cellar doors. But remember that in parts of the city you can vend on a sidewalk so long it is at least 10 feet. And cellar doors are quite long in the city. They can easily cross over into this 8 by 3 zone. And it would make perfect sense for the legislature to say when a cellar door crosses over into that 8 by 3 zone, you can't vend there. Thank you. Thank you. Good morning, your honors. My name is Joshua Fitch for the appellees. May it please the court. What you've just heard from appellants is essentially what their brief has said all along, which is they expect this court, as they did the district court, to simply read away every canon of statutory interpretation. Because as you will note in their brief, they refer to none. Not a single canon of statutory interpretation supports their view in this case. Even when they describe- How about the away from the curb language? It's pretty clear in the statute, right? It's not, your honor, if I may, it's not saying that you need to be away from the curb. It's saying that shall occupy more than three linear feet to be measured from the curb toward the property line, which is actually consistent with the way that New York, other statutes, define the width of a subway. I mean, the width of a sidewalk. Because there is no definition of the length of a sidewalk, because the length of a sidewalk runs continuously around a building block. The width of the sidewalk has to be defined between the curb and the property line. And I would say to that point, even when they describe this restriction, even when counsel just referred to a requirement that vendors be within three feet of the curb, within three feet from is exactly the language, or within blank feet from, is exactly the language in numerous other sections in this statute. Before we look to the other sections, I think I understand the city's interpretation of this provision. But I'm not sure I understand what your interpretation is. Are you saying that the provision is just requiring that any vendor be no more than eight feet long and three feet wide, any vending establishment? Essentially, in that amount of space, Your Honor, yes. They cannot occupy that amount of space. More than that amount of space. Excuse me, I'm sorry. More than that amount of space. More than that amount of space, yes. And the other provisions- So if that's the interpretation, isn't this an incredibly weird way to say what the width of the cart should be? I mean, why measure from the curb at all? Well, it's not saying, I don't believe it's saying just the width of the cart. It's saying no specialized vending licensee shall occupy. Meaning, most of these, Your Honor, respectfully, are disabled vendors. So they might be in wheelchairs. They might otherwise be occupying additional space other than the vending cart itself. So it's the space that they can totally occupy, cart and themselves included on the sidewalk. Not just the vending cart. That's why it wouldn't make sense to just specify the cart's dimensions. But if the idea is it's specifying how many feet wide the space can be, why measure it from the curb if it has no relationship to the curb? Well, it has to measure it from the curb towards the property line because that's the width of the sidewalk. If it measured it in the opposite direction, it would be into the street. And vending actually is permitted in the street pursuant to 35A7J. That's why it has to be, it's referring to the width and the length of the sidewalk. It's referring to sidewalk vending, not street vending. That's why it's measuring it from the curb toward the property line. And I believe I referenced in my brief other New York courts and statutes that define a sidewalk to be the distance from the curb to the building line. It's not a unique drafting measure that was meant to keep these vendors next to the curb. And I would point out, there was a lot of talk in the brief and even an argument about common understanding in what you see every day on the street. I would implore you, the next time you see a vendor on the street, take a look and see where they are on the curb. They might be near the curb, but they're certainly not flush to the curb. And a vending cart itself is typically about three feet in width. So in order for them to comply with the city's version of the statute, they would literally have to be flush with the curb. The vendor potentially standing out in the street, creating impediments to traffic. They're never against the curb like that. They're usually two or three feet off of the curb into the sidewalk. Doesn't the district court's interpretation basically prevent vendors from placing their eight foot by three foot carts perpendicular to the curb? I'm sorry, Your Honor. I'm not following you. As you look at the district court's interpretation of subsection I, right? It does something more than, say, what a cart's dimension should be, right? Right. In effect, according to the district court's interpretation, doesn't it prevent vendors from placing their eight foot by three foot carts perpendicular to the curb? You mean the long way versus the width? Because essentially the width is always going to be perpendicular to the curb anyway. Yeah, it would prevent it from being placed the long way. But the statute would prevent that anyway because the eight feet, assuming the long way is the eight feet or the longer section of the cart, that section could not occupy more than three feet under any circumstance anyway. Unless we're talking about a square cart that was three by three, you'd never really have that scenario. With respect to a couple other points that I believe Your Honor raised with respect to the decisions of the ECB board, the appellants refer to several appeals decisions of the ECB board as being controlling. Specifically, I believe they just referenced the Dalton decision. It's interestingly enough, not only did none of those decisions ever deal with the interpretation of the statute as the district court found, but each and every single one of the 128 decisions where the ECB courts actually did deal with the interpretation of the statute all occurred after Dalton, which appellants claim is the most relevant and telling example of what the ECB appeals court's interpretation of the statute was. It makes no sense, again, if we're talking about common sense, that a lower court, I mean if Your Honors were to issue a decision and someone said that decision said X, but every single district court was interpreting it as Y. Either the district courts are all wrong, or they're rogue courts, or the person who's saying this court's decision is X is not right. Those issues, that issue, the interpretation of that statute was never raised in any of those appeals decisions. It was raised in those ECB lower court decisions and it was found specifically to comport with the definition that the district court found. You're going to have to correct me to make sure I'm understanding this correctly, but if we were to conclude that the city's construction is reasonable, we really don't have to construe this provision, right? Because Hine would say if it would be a reasonable mistake of law, assuming without deciding that it is a mistake, it was reasonable, the city would still be entitled to relief. Your Honor, that's correct. But I would say to that point, one, setting aside the waiver issue, because it's clear that the Hine issue was never raised in their moving papers, and this was their motion to dismiss. They raised a probable cause, and Hine is one of the facets of probable cause. Sure. It's just interestingly that the seminal case on reasonable mistake would make no appearance in their moving papers. But setting that aside, the fact is that this court in Askins makes a distinction between individual liability and qualified immunity. Hines is a reasonable cause in the context of a investigatory stop in a criminal case, not a relief from civil liability. And what I would submit is that the one, again, my first point would be one, it's not a reasonable mistake because the statute is unambiguous. So it does not insulate officers or municipalities, for that matter, from sloppy study of the law. But two is that it would turn, it would fold the municipal exception to qualified immunity onto itself. I'm not understanding that argument. I read your papers carefully. This is not about qualified immunity. Hine is about the meaning of the Fourth Amendment. And your clients have to establish a Fourth Amendment violation, and if a reasonable mistake of law means that the officers still acted on the basis of probable cause, there would be no Fourth Amendment violation. Your Honor, I agree with that take on it, and that's true. The issue I have is that the Supreme Court and this Court's precedent establish that a municipality cannot make reasonable mistakes. That analysis is not part of the municipality analysis because you're not talking about individual officers who are interpreting the law. We're talking about a conscious choice that this municipality took in order to interpret the law this way. And if- The Fourth Amendment would mean one thing if an individual officer is making an assessment of reasonable suspicion on his or her own, and would mean, has to mean something else if it's a policy of the city. Well, my position is that Hine does not apply in the civil context because it is not talking about, as this Court has distinguished, in the context of civil liability under 1983, the questions of fact related to probable cause are part of the first prong of the analysis. Questions of law, reasonable mistakes of law, and the reasonableness of an interpretation of a questionable area of law is distinctly part of the qualified immunity analysis. If you import an additional, if there's an additional reasonable mistake requirement, I cannot see a situation where a municipality would ever be liable in a situation where they're interpreting the law if they were making a reasonable mistake. Because Askins would be essentially undone. Because if the officer could make a reasonable mistake and be entitled to qualified immunity, but in that situation, a municipality couldn't, how are you circumventing that to allow the municipality at the first level to make a reasonable mistake, but not at the second level? To me, it's an incongruous position. On the waiver issue, you say that the words, reasonable mistake of law, can't be found in the city's moving papers below, and I understand that. But they do state the question that, the question is whether the city, and I'm quoting, had a reasonable legal justification for issuing the summons. Why isn't that sufficient to preserve the argument? A reasonable legal justification, I don't believe, means the same thing as making a reasonable interpretation based on the statute. The reasonable justification could mean maybe there was another reason to issue these summonses unrelated to this particular statute, say under a Devon Peck theory. That said, again, I think the most telling, whether they use the word reasonable mistake or not, is the seminal case on this issue is Hain. And that case makes no appearance in their moving brief. The first time it makes an appearance is in their reply brief, which tells me that perhaps they realized that their interpretation was not correct. I don't want to give myself credit for that, but that's what it looks like to me. With respect to just a few more things I would like to say, is that, again, the idea that certain terms, I believe one of your honors used the term boots and suspenders, belt and suspenders, as a sloppy, basically every statutory canon that needs to be read away has to be excused by that. The idea that the term buildings, as it's referenced in other subsections, means something different than its everyday understanding, not only is there no evidence in the statute of that, but the rules of statutory construction say if the word building is not defined in the statute, which it is not, then it takes on its everyday, ordinary understanding. They cannot read away words that everyone knows what these words mean and say that they mean something else. To say a display window of a fixed location business is a newsstand, when newsstands are specifically referenced in another section in the statute, again, to me it's telling of the fact that the only way that their interpretation works is if all of the statutory canons are ignored in this case. The simple fact is my clients were vending lawfully in the Met Plaza, which is a 70,000 square foot area. This is not a small sidewalk. Sidewalk congestion was never an issue in this. This statute had never been enforced this way prior to August in 2011, and then for two years when they were trying to move these individuals who were lawfully vending, trying to make a living after the service to our country, they tried to move these individuals, and when it didn't work, when ECB told them it didn't work, they stopped. When we filed a lawsuit, they stopped. And now they're trying to justify their behavior after the fact. Is there a problem because there's not enough curbside space for all the vendors that wanted to vend there? In other words, why in front of the Met so much? Is that because there's a lot of people we know, right? And is that because all the space would be taken up right next to the street and they had to find another location to put their carts? Is it just too many vendors for the three feet from the curb location that's linear there? Why they were being moved? Is that what you're asking, Your Honor? Why they wouldn't just comply with the be within three feet of the curb. It seems as if because there's so many people there, there's too many carts for that space. Is that right? I can't answer the question of why they wouldn't comply with an illegal directive. I mean, I know why they chose not to comply with what they believed was an illegal directive. The reason why they were being, you know, the reason why we, the evidence that we had that's not before this court that was sort of conceded, was that there are paying vendors who vend in these locations and who refuse to, who will refuse to ultimately pay for those spots when a disabled veteran vendor can vend there for free. They don't have to lease these locations. There's no bidding process. The only thing that they have to worry about is priority with other vendors and the number of vendors per sidewalk block, which, again, I think all of those other provisions, whether it's the length of sidewalk, the structures that you can and cannot sit next, or vend next to, all create inherent protections against sidewalk congestion that makes it unnecessary. And the fact of the matter is, in addition to all the other sections that would be made superfluous, the one section where they specifically made this rule, where you had to be at the furthest point away from the buildings in Section H, they said it clearly. No one disputes that that is exactly what they're saying. That's the interpretation that the city wants. Why would the legislature have written it that way there and not written it that way anywhere else? Did I hear you say that there are some specialized vending licensees who operate on the street today? I don't think it is a practical reality. They do, but there is a statute that permits them to do that. Thank you. Thank you, Your Honors. Could I just follow up on Judge Livingston's question on the paid vendors, the non-disabled veteran street vendors? Do they have to comply with the three feet from the curb requirement, too? They do, but it's under a different regime. Has there been a challenge to that, to say it's unclear? Not that I'm aware of, no. I don't know if the language is identical because that is a city regulation, city law, and this was enacted by the state legislature. I mean, just a few things. I think the main statutory canon of interpretation here is plain language, and I still have not heard from the plaintiffs why the legislature made that core drafting choice in 7i. And that's the first clause is directional, and the second clause is tied to a fixed point and measured toward the property line. We're not talking about the width of a sidewalk. It doesn't matter if you're measuring it in a particular direction from a fixed point under plaintiff's understanding. We're talking under their understanding about a purely dimensional understanding of the statute, and if that's what the legislature intended, it would have said a cart can be 8 feet by 3 feet or a vendor can occupy 8 feet by 3 feet, and if they cared a little bit more and all they cared about that it was parallel to the curb, they would have said you can occupy 8 feet 3 feet parallel to the curb. They didn't say perpendicular. They were quite deliberate in saying the 3 feet is to be measured from the curb toward the property line. I think my adversary is also laboring under the same misapprehension of Chaim that the district court did, and I think the problem seems to be that this focus on the word mistake, and it's true that reasonable mistakes of law are captured in probable cause, but the more important point of Chaim is that the touchstone of probable cause is reasonableness, and it might be awkward to think about what is a mistake of law in a Monel claim, but you're always talking about reasonableness, including when you're talking about legal interpretations, and I'd just say that ruling on Chaim is probably the cleanest way to resolve this case. It might not provide an authoritative construction of the statute, but it resolves this case before the court answers the federal question without intruding on a domain that is ordinarily better left to state courts. Thank you, Your Honors, for your time. Thank you. Thank you both for your arguments. The court will reserve decision. The final two cases, Zappin and Lowe, are on submission. The clerk will adjourn court. Court is adjourned.